cc: LEK

# ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 12 2010

at 3 o'clock and 30 min. P. M.
SUE BEITIA, CLERK

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOACHIM P. COX                7520-0
    jcox@goodsill.com
CLAIRE E. GOLDBERG            8786-0
    cgoldberg@goodsill.com
Alii Place, Suite 1800
1099 Alakea Street
Honolulu, Hawaii 96813
Telephone: (808) 547-5600
Facsimile: (808) 547-5880

Attorneys for Plaintiff
COUNTY OF MAUI

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

COUNTY OF MAUI,

          Plaintiff,

   vs.

MERRILL LYNCH PIERCE FENNER
& SMITH INCORPORATED;
MERRILL LYNCH & CO.; MERRILL
LYNCH & CO., INC.,

          Defendants.

CIVIL NO. CV 10-00077 LEK

COMPLAINT; DEMAND FOR
JURY TRIAL; SUMMONS

## COMPLAINT

Plaintiff County of Maui, by and through its attorneys, Goodsill Anderson Quinn & Stifel, LLP and for a complaint against the Defendants above-named, alleges and avers as follows:

## PARTIES

1.      At all times material herein, COUNTY OF MAUI ("Plaintiff") was a political subdivision of the State of Hawaii.

2.      At all times material herein, Defendant MERRILL LYNCH PIERCE FENNER & SMITH, INCORPORATED ("ML") (also known as Merrill Lynch, Merrill Lynch & Co., and Merrill Lynch Pierce Fenner & Smith Inc.) was a Delaware corporation with its principal place of business in New York. ML is registered with the SEC and the Financial Industry Regulatory Authority ("FINRA") as a broker-dealer. ML does business through offices it maintains in Honolulu, Hawaii.

3.      ML was a wholly owned subsidiary of MERRILL LYNCH & CO., INC. ("Merrill"). Merrill is a Delaware corporation with its principal executive offices in New York, New York. In January 2009, Merrill became a wholly owned subsidiary of Bank of America Corporation.

4.     ML and Merrill and are hereinafter collectively referred to as "Defendants."

5.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 because this action arises under the laws of the United States and there is diversity of citizenship between the parties and the amount in controversy is in excess of $75,000 exclusive of interest and costs.

6.     Venue is proper in the District of Hawaii pursuant to 28 U.S.C. §1391(a) because ML maintains an office in Honolulu, Hawaii and a substantial part of the events, representations or omissions giving rise to the claim occurred in the District of Hawaii.

7.     Plaintiff has contemporaneously with the filing of this Complaint, served a written demand on FINRA in accordance with the FINRA Arbitration Code to arbitrate all or substantially all of the claims alleged herein. ML is a member of FINRA and is required to submit to Arbitration under the FINRA Code of Arbitration Procedure Rule 12200 which provides that "Parties must arbitrate a dispute under the Code if:  Arbitration under the Code is either: (1) Required by a written agreement, or (2) Requested by a customer; and The dispute is between a customer and a member or associated person of a member; and The dispute arises in connection with the business activities of the member . . ."

3

8.      ML is a member of FINRA and Plaintiff is a customer as defined by Rule 12100. A "customer" is defined as follows: "A customer shall not include a broker or dealer." Plaintiff requested arbitration of a dispute that arose in connection with the business activities of ML. Therefore, all or substantially all of the claims alleged in this matter will be subject to FINRA Arbitration.

## GENERAL ALLEGATIONS

9.      This action arises out of ML's fraud, and/or negligent misrepresentations and omissions, and/or breach of fiduciary obligations to Plaintiff in connection with the sale to Plaintiff of student loan auction rate securities ("SLARS").

10.      Auction rate securities ("ARS") are interest-bearing debt instruments. SLARS are ARS secured by pools of student loans guaranteed by government agencies under the Federal Family Education Loan Program ("FFELP").

11.      The interest rates on SLARS periodically reset typically every 7, 14, 28, or 35 days, using a bidding process known as a Dutch auction. The auctions are run by one or more broker-dealers (the "Auction Manager"), usually one or more of the SLARS underwriters. ML acted as Auction Manager for many SLARS auctions.

12.    ML marketed SLARS to investors as "money market alternatives" and "liquid investments." These statements were false and misleading. The liquidity of SLARS depended on ML and other SLARS Auction Managers supporting the auctions. From on or about August 2007, ML was aware of an increasing risk of widespread market failure. In February 2008, ML and other Auction Managers stopped supporting the auctions and the SLARS became illiquid.

13.    ML's misleading statements and the collapse of the ARS market resulted in regulatory investigations of ML and other ARS broker-dealers by the United States Securities and Exchange Commission ("SEC") and numerous state regulators. On or about August 21, 2008, ML announced a settlement in principle with the SEC, the New York Attorney General (the "NYAG") and other state regulators (the "Settlement").

14.    Between August 2007 and January 2008, Plaintiff purchased approximately $44.2 million worth of SLARS. Plaintiff purchased the SLARS using County of Maui Treasury funds. ML knew or should have known that Section 46-50 of the Hawaii Revised Statutes and the County of Maui Investment Policy required Plaintiff to invest in highly-liquid short term investments with a maturity not more than five years from the date of investment.

15.     Beginning on or about August 2007, ML knew or should have known, but did not disclose to Plaintiff, that the SLARS market saw a decrease in demand that led ML to purchase more and more SLARS for its own inventory in order to keep the auctions from failing.  ML then prepared for potential widespread market failure and planned for the possibility of ending its support for the auctions which it knew or should have known would result in SLARS becoming illiquid securities.  As part of ML's plan, ML aggressively marketed SLARS to Plaintiff and other investors to reduce ML's own inventory of SLARS.

16.     Instead of disclosing the decreased demand for SLARS, its internal plans and discussions, and the extent to which ML was supporting the auctions to prevent auction failure, ML fraudulently sold SLARS to Plaintiff between August 2007 and January 2008 as liquid investments.

17.     On or about February 13, 2008, ML abandoned its practice of supporting SLARS auctions.  The ARS market collapsed.  Plaintiff was left stranded with $44,200,000.00 in SLARS that it purchased on and after August 16, 2007 which it could no longer sell at par.

18.     Had ML honestly disclosed to Plaintiff the growing risks associated with investing in SLARS, and had ML disclosed that SLARS did not in fact meet the requirements of HRS §46-50, Plaintiff would not have purchased SLARS at all.

19.    Having misrepresented the nature of SLARS, having not disclosed to Plaintiff the growing concern related to the liquidity of SLARS and/or having failed to support the market for SLARS, ML has caused damages to Plaintiff by, among other things, selling to Plaintiff securities which were represented to be, but are not, safe and liquid investments.

## STATEMENT OF FACTS

**A.    The ARS Market**

20.    ARS allowed issuers to obtain long-term financing at less expensive, short-term rates.  ARS purchasers were willing to accept short-term rates because they reasonably believed that ARS could be readily disposed of at par through periodic auctions.

21.    At Dutch auctions where ARS are marketed, bidders generally state the number of ARS they wish to purchase and the minimum interest rate they are willing to accept.  Bids are ranked, from lowest to highest, according to the minimum interest rate each bidder is willing to accept.  The lowest interest rate required to sell all of the ARS available at auction, known as the "clearing rate," becomes the rate paid to all holders of that particular security until the next auction.  The process is then repeated, typically every 7, 14, 28, or 35 days.  In a successful auction, the number of shares bid for purchase at a particular rate was equal to or greater than the number of shares offered for sale at those rates.

22.   Issuers of ARS select and pay firms, including ML, to act as a dealer through which investors submitted orders at auctions for the issuers' securities.  A firm so selected was called an "auction dealer," "broker dealer," or "auction manager," and was said to "participate" in auctions.  A firm that underwrote an issuance of ARS generally served as auction dealer for those ARS.

23.   When there are not enough orders to purchase all of the ARS being sold, a "failed" auction occurs.  In the event of a failed auction, investors cannot sell their ARS.  If an auction failed, however, the holder of an ARS was entitled to collect dividends or interest at a predetermined rate until the next auction.  The predetermined rate of interest that was paid in the event of a failed auction was typically referred to as the "maximum rate."

24.   The maximum rate was intended to ensure that the ARS remained liquid if the auction failed, by attracting new buyers or prompting the issuer to refinance.  If the maximum rate was insufficient to attract liquidity in the event of an auction failure, however, the risk characteristics of an ARS were fundamentally altered.  An ARS that carried a low maximum rate was entirely dependent on the auction dealer's intervention and "support" for the periodic auctions to ensure liquidity, and in the absence of the auction dealer's support, any auction failure would render the security illiquid, as the maximum rate could not be counted on to attract new buyers or prompt the issuer to refinance.

**B.     ML Engaged In A Scheme To Defraud Purchasers Of ARS**

25.     As a leading underwriter of ARS, ML also acted as the managing broker-dealer for many issuers of ARS.  When acting as a sole manager, ML was the only firm that could submit bids into the auction on behalf of its clients and/or other broker-dealers who wanted to buy and/or sell any ARS.  When acting as lead manager, ML was the primary firm that could submit bids into the auction, while other broker-dealers were able to submit orders on behalf of their clients as well.

26.     ML received revenue in connection with ARS, including an underwriting fee representing a percentage of the total amount of proceeds from the ARS issuance and a fee for managing the auctions.

27.     Upon information and belief, ML underwrote billions of dollars of ARS, placing additional supply in an already saturated market.  To accommodate the demands of issuers and obtain high credit ratings even as underwriting standards deteriorated, ARS were issued with maximum rates that were capped at insufficient levels to attract liquidity in the event of auction failure. Therefore, ML needed to suppress auction failures to prevent these low maximum rates from becoming widely known to ARS investors.

28.    Upon information and belief, ML engaged in deceptive and manipulative tactics directed at ARS investors to create the appearance of a safe, liquid auction market.  ML's manipulative conduct included the following:

- maintaining a policy of intervening in auctions for which ML served as the sole or lead auction dealer, to create the appearance of stability in the ARS market, mask the inherent illiquidity of ARS, and prevent auction failures;

- making false and misleading statements and incomplete disclosures about the liquidity of ARS and ML's role in propping up the ARS market;

- routinely intervening in auctions to set the rates of interest or dividends paid on those securities and deprive investors of the information necessary to assess the risk and volatility of ARS;

- causing its purportedly independent research analysts to publish research reports extolling the benefits of investing in ARS, in violation of ML's own internal policies;

- pressuring its financial advisors to sell ARS; and

- providing extraordinary financial incentives to financial advisors and research analysts to promote the sale of ARS.

29.    Upon information and belief, ML's scheme began to unravel when ML and other dealers allowed a discrete segment of the ARS market to fail, as credit markets weakened in the summer and fall of 2007.  When these auctions failed, many institutional investors began liquidating their positions in ARS, and the overall deterioration of the credit markets lead to further selling pressure from

corporate and retail holders of ARS. In response, ML expanded its manipulative practices in an attempt to prop up the remainder of the ARS market, conceal the liquidity characteristics of ARS and protect its own balance sheets.

### i. ML Maintained A Policy Of Intervening In Auctions For Which It Was The Sole Or Lead Auction Dealer To Create The Appearance Of Stability And Liquidity And To Prevent Auction Failures.

30.    ML routinely placed support bids in auctions which it served as the sole auction dealer or the lead auction dealer. Through the placement of these support bids, ML acquired ARS for its own account when the auctions otherwise would have failed due to lack of sufficient demand.

31.    Until about August 2007, ML followed a uniform policy of placing support bids if needed to prevent failures in auctions for which it was the sole or lead auction dealer. ML was able to place support bids because it was aware of the other bids in the auctions and could place its own bids after the bidding deadline for other investors.

32.    ML failed to disclose to investors that it invariably placed support bids in auctions for which it was the sole or lead auction dealer to prevent auction failures and that the impact of its extensive and sustained interventions created the outward appearance that ARS were readily liquid investments.

33.     By intervening to prevent auction failures and set interest rates, ML masked the liquidity risks inherent in ARS. Due to the lack of transparency in the auction market, Plaintiff had no way of knowing the extent to which ML's interventions were needed to sustain the ARS market and ensure that auctions continued to clear.

34.     Had ML not supported these auctions, or had ML disclosed the extent of its interventions, widespread auction failures would have alerted the public to the true risk characteristics of the ARS for which ML served as an auction dealer. Instead, ML's actions created a façade of liquidity, leading purchasers of ARS to believe their instruments could be readily liquidated at periodic auctions.

> **ii.     ML Made False And Misleading Statements And Incomplete Disclosures About SLARS Between August 2007 And February 2008.**

35.     Between August 2007 and February 2008, ML falsely described SLARS and the ARS market to Plaintiff, and failed to provide sufficient information to allow Plaintiff to understand the risks of SLARS.

36.     At all relevant times, ML knew or should have known that Plaintiff was purchasing investments pursuant to HRS §46-50 and ML knew or should have known the requirements thereof. ML knew or should have known that all the investments purchased by Plaintiff were subject to the requirements of HRS

§46-50 which limited Plaintiff's investments to instruments that had a maturity date no more than five years from the date of investment.

37.    Despite this knowledge, ML actively marketed SLARS to Plaintiff as suitable for its needs.  ML's financial advisors within its Hawaii office regularly contacted Plaintiff, sometimes several times a day, to market/sell SLARS.

38.    In August 2007 through January 2008, knowing Plaintiff's investment requirements, ML sold SLARS to Plaintiff in various transactions amounting to $44,200,000.00.

39.    As part of ML's marketing of SLARS to Plaintiff, ML described SLARS as highly-liquid safe investments, similar to money market funds.

40.    On February 26, 2007, ML emailed a report to Plaintiff prepared by ML preferred strategists regarding the effect of FASB's decision to prohibit corporations from accounting for ARS as cash equivalent instruments.  In this report, reviewed by Plaintiff, ML minimized the significance of the FASB decision stating:

> Our bottom line around the current accounting challenge facing the auction market is that it is nothing more than that.  It is not the death of the auction market.  It is a challenge that will result in a decline in the absolute number of investors in the short term.  It is also a situation

that may result in a buying opportunity for those investors that remain in the market.

41.    Among other statements made in the report are that ML "ha[d] never heard of an investor stuck into an extended auction against the investor's wishes."

42.    ML further represented that it "believes that [auction securities] can be treated as cash equivalents under FASB 95, provided they can satisfy the 90-day restriction."

43.    On March 22, 2007, a financial advisor in ML's Honolulu office emailed a report to Plaintiff prepared by ML strategists regarding the market impact from the Financial Accounting Standards Board's ("FASB's") elimination of a "cash equivalents" classification.  In this report reviewed by Plaintiff, ML expressed that the "market impact should be positive with greater liquidity."

44.    On April 26, 2007, a financial advisor in ML's Honolulu office emailed a report to Plaintiff prepared by ML strategists providing "An Overview of Auction Rate Student Loan ABS Market."  In this report, reviewed by Plaintiff, ML emphasized that "there ha[d] been no failed auctions in the student loan sector" and that ML "view[ed] the risk of a failed auction to be minimal."

45.    On December 6, 2007, ML strategists published a report featuring ARS as offering "extraordinary values" for both the short-term investor

and the "cash investor," noting that investors in auction securities are largely shielded from "the problems facing the financial market" and that "the auction preferred market offers excellent value for investors looking for short-term instruments or money market alternatives."

46.    This December 6, 2007 report was emailed to Plaintiff the same day by a financial advisor in the Honolulu office of ML. Plaintiff then reviewed this report.

47.    On December 13, 2007, ML issued another update regarding SLARS citing "strong credit quality and attractive yields" and reminding investors that "no failed auctions have occurred in the student loan ARS market." This report was emailed by financial advisors in ML's Honolulu office to Plaintiff on December 13, 2007. Plaintiff then reviewed this report.

48.    On February 8, 2008, with knowledge that another major broker-dealer had failed six auctions the day before, ML released for use by its sales force and the public a research report entitled "Back to Basics in the Auction Market" which, on the front page, touted the auction market's "resiliency" and referred to "greater liquidity." The report minimized the recent failures and encouraged customers to invest in its securities.

49.    As late as February 12, 2008, a financial advisor in ML's Honolulu office emailed Plaintiff the report entitled "Back to Basics in the Auction

Market." Plaintiff reviewed this report wherein ML reiterated that ARS has only a "slightly lesser degree of liquidity" than money market funds and reminds investors that auctions "hardly ever" fail. ML further expressed that "[t]he reports of the imminent demise of the auction market seem to be greatly exaggerated, again."

50.     With regard to ML's role in sustaining the ARS market, ML failed to disclose to Plaintiff the purpose of its interventions, the extent of its interventions in auctions, or the impact of its interventions on the market for ARS and the attendant risks of acquiring ARS securities. ML failed to disclose to Plaintiff that it maintained a policy of placing support bids as needed to suppress auction failures for auctions which it served as sole or lead auction dealer, that these support bids masked the lack of liquidity in the market, and that the auctions would fail without these support bids. ML further failed to disclose the growing risk of investing in SLARS and the possibility for widespread failure of the ARS market.

   **iii.    ML Routinely Intervened In Auctions To Set The Rates Of Interest Paid On ARS.**

51.     Upon information and belief, ML's ARS Trading Desk set the clearing rate for the auctions that would have failed but for ML's support bids. For each auction, the ARS Trading Desk knew all the bids that had been placed by

both holders and prospective buyers of the securities. Armed with this information, the ARS Trading Desk placed buy bids at specified rates and in sufficient amounts that ensured the auction would clear at those rates.

52.    Upon information and belief, ML set interest rates in such a manner as to promote continued sales of ARS to the public, but without letting clearing rates become or remain so high as to alienate the issuer clients on whom ML depended for continuing business and attendant underwriting commissions and auction dealer fees.

53.    Upon information and belief, by intervening in the auctions, ML set the clearing rate but also added ARS to its own inventory. ML then reduced the excess inventory between auction periods by selling ARS at the clearing rate that ML had established at the previous auction.

54.    Because purchasers of income securities such as bonds and preferred stocks consider higher interest rates to be an indicator of risk, ML's interventions to manage interest rates and suppress auction failures deprived investors of objective information that it needed to evaluate the true risk characteristics of ARS.

55.    Thus, ML's conduct in rigging the clearing rates sent a false signal about the demand for and liquidity of ARS.

### iv.   ML Used Its Purportedly Independent Research Group To Prop Up The ARS Market And Sell ARS In Violation Of Its Internal Policies

56.   Upon information and belief, ML's policy and procedures established a "Chinese Wall" designed to restrict and monitor the flow of material non-public information between the various departments of ML in order to avoid the misuse of such information and the appearance of impropriety as well as to manage potential conflicts of interest.

57.   Upon information and belief, in violation of these internal policies, personnel from ML's investment bank and ARS Trading Desk shared material non-public information about ML's inventory of ARS with ML's purportedly independent research analysts, and ML used those research analysts to make positive statements about ARS while downplaying the associated risks.

58.   Upon information and belief, ML's research analysts encouraged ML's financial advisors to sell ARS, and touted the benefits of ARS in several research reports written at the behest of and/or with input of the ARS Trading Desk.  These research reports were designed to sustain the façade of liquidity in the market for ARS and to perpetuate the illusion that ARS traded at par.

59.   Upon information and belief, the ARS Trading Desk continued to pressure ML's Research Department to publish positive research reports on ARS

throughout the fall of 2007 and into February 2008. ML was effectively engaging its Research Department in its scheme to sell ML's inventory of ARS to investors without disclosing and downplaying the risks associated with these investments.

60.     As part of this scheme, on December 6, 2007, ML published a research report entitled, "Fixed Income Digest Special Edition: Enduring value in auction securities." The report explained that "the auction preferred market, offers excellent value for investors looking for short-term instruments or money market alternatives"; that "individual investors are largely shielded" from problems facing the financial markets; that closed end fund preferred auction rate securities were "a conservative's conservative auction security"; that "[c]redit fears" were "largely misplaced in [the] auction market"; that "the worries of a failed auction are misplaced: failed auctions are extremely rare, and investors may have an exaggerated view of their consequences"; that "[i]n the unlikely event of a failed auction. . . [t]he investor who is willing to wait for a subsequent auction to clear may be able to eventually receive par value back"; that the "main risk" for investors in ARS was "lower rates"; and that "auction securities still make sense for investors who need ready access to their funds." Upon information and belief, the ML analysts who published these reports knew that each of the foregoing statements concerning ARS was literally false and misleading at the time.

61.   Plaintiff reviewed this report on December 6, 2007, after receiving it by email from an investment advisor at ML's Honolulu office.

62.   Upon information and belief, in promoting ARS, ML research analysts obtained improper access to material non-public information about ML's inventory and sales techniques for ARS in contravention of the "Chinese Wall" ML had purportedly erected between its Research Department and sales and trading groups.

63.   Upon information and belief, between August 2007 and February 2008, ML research analysts were informed of the extent of ML's inventory of ARS, ML's specific plans to reduce its inventory, ML's need to increase interest rates to counteract the lack of liquidity, and the financial incentives that ML provided to its financial advisors for selling ARS.

64.   Upon information and belief, ML's research analysts used this material non-public information to make false and misleading statements about ARS in their research reports, while downplaying or avoiding frank discussions about the risks associated with ARS.  ML knew or should have known that ML's financial advisors would use the information in those research reports to sell ARS.

### v.   ML Pressured Its Financial Advisors To Sell ARS To Investors

65.     Upon information and belief, when ML intervened to support an otherwise failing auction, it increased the amount of ARS in its proprietary account, pressing against the ceiling for ARS holdings set internally by ML's risk management policies.  Those policies allowed ML to hold not more than a specified amount of ARS at any given time.  As a result, starting on or about August 2007, ML was under consistent pressure to reduce its inventory of ARS.

66.     Upon information and belief, as the result of pressure to reduce its inventory, ML engaged in concerted efforts to limit its increased exposure to ARS on its own balance sheet by pressuring its financial advisors to attract new buyers to the market.

67.     Upon information and belief, ML withheld information from its financial advisors in its Honolulu office who in turn did not disclose to investors, including Plaintiff, that auctions for ARS would fail *en masse* if ML ceased supporting the market for ARS, that investors' ARS holdings would become illiquid as a result of auction failures, that ML was under continued pressure to reduce its inventory of ARS, that ML was contemplating withdrawing from the ARS market altogether to limit its exposure to ARS, and that ML believed that

anticipated failures by other auction managers could cause a "run" on the market for ARS and result in the collapse of that market.

### vi.   ML Provided Extraordinary Incentives To Its Financial Advisors And Research Analysts For Promoting Sales Of ARS

68.   Upon information and belief, ML provided extraordinary financial incentives for its personnel to promote sales of ARS.

69.   Upon information and belief, ML paid its financial advisors on an annualized basis for the aggregate amount of ARS they sold to Plaintiff and investors alike.

70.   Upon information and belief, ML financial advisors would not have earned any commissions, or would have earned much smaller commissions, had they sold money market funds to investors, including Plaintiff. The revenue sharing paid by ML to its financial advisors provided a disproportionate incentive for those financial advisors to sell ARS in relation to other cash management products available to them.

71.   Upon information and belief, as the ARS market tightened in the second half of 2007, ML offered further incentives to its financial advisors to sell ARS.

72.    Upon information and belief, ML adjusted the amount that it paid based upon the urgency of its need to remove those securities from its balance sheet.

73.    In addition, upon information and belief, ML improperly compensated its research analysts for promoting the sale of ARS in research reports and conference calls at the behest of the ARS Trading Desk.

### vii.    ML Withdraws From The ARS Market

74.    When the credit market deteriorated in the summer of 2007, ML and several other major auction dealers, chose not to intervene to prevent failures of auctions for certain ARS.

75.    Many of the ARS that failed consisted of collateralized residential mortgage-backed securities that were secured by income streams from sub-prime mortgages.  By the summer of 2007, ML recognized that the sub-prime mortgage market was collapsing.  Merrill's exposure to that market was substantial.

76.    Under pressure from Merrill to limit its exposure to sub-prime mortgages, ML elected not to support the auctions for certain ARS beginning on or about August 2007.  ML declined to place support bids allowing those auctions to fail.  ML also refused to place support bids in subsequent auctions for those ARS, causing those securities to remain illiquid.

77.   Upon information and belief, some institutional investors began to sell down their ARS holdings beginning with the initial wave of auction failures in August 2007. As a result, ML intensified its efforts to prop up the remainder of the ARS market.

78.   Upon information and belief, ML continued to monitor the industry for auction failures by other auction dealers throughout the fall of 2007 and into early 2008. ML and other auction dealers continued to support the market until they collectively abandoned the auction rate securities market in February 2008.

79.   On February 13, 2008, ML and all other major auction dealers of ARS withdrew their support for the ARS market. As a result, 87% of all auctions for ARS failed.

80.   At no time before February 13, 2008 did ML notify Plaintiff or publicly announce that it intended to withdraw its support for the ARS market.

81.   As a result of the withdrawal of support by ML for the ARS market, the ARS market has collapsed, rendering all outstanding ARS illiquid.

82.   On February 13, 2008, the first of Plaintiff's SLARS investments became illiquid as the result of a failed auction.

83.   Subsequently every SLARS investment remaining in Plaintiff's portfolio became illiquid as the result of a failed auction on the following dates:

February 21, 2008, February 26, 2008, February 28, 2008, February 29, 2008, March 6, 2008 and March 12, 2008.

84.    On July 28, 2008, Plaintiff sent a letter to ML notifying ML that it was temporarily suspended from participating in any new investments with Plaintiff until the liquidity of its SLARS investments was restored.

85.    Plaintiff did not receive a response to this letter.

86.    Finally, on November 7, 2008, ML declined Plaintiff's request to have ML repurchase its illiquid SLARS investment.

87.    On or about September 23, 2009, ML repurchased a limited amount of Plaintiff's SLARS leaving Plaintiff, as of February 10, 2010, with $32,000,000 in illiquid SLARS in its investment portfolio at ML.

## C.    **Defendants Acted With Scienter**

### i.    **ARS Were Lucrative For Defendants**

88.    As one of the largest underwriters and auction dealers of ARS, ML earned substantial fees for its services from the issuers of those securities.

89.    Upon information and belief, pursuant to agreements with the issuers, ML generally served as an auction dealer for the ARS it had underwritten and was paid an annualized auction dealer fee for managing auctions.

### ii.   Defendants Took Advantage Of The Opportunity To Manipulate The Market For ARS

90.   Upon information and belief, unlike fixed-rate bonds, commercial paper, or money market funds, ARS are designed with the understanding that the holder will actively "trade" the securities by monitoring the rates of return paid on ARS in relation to other short-term investment options available to the holder, and "roll at rate" (an instruction to sell unless the rate paid on the security is equal to or greater than a specified rate of interest) or sell the security outright if the rate the holder anticipates receiving on the ARS is inferior to other alternatives.

91.   Upon information and belief, because purchasers of ARS were not the institutional buyers who were originally intended to serve as the target buyers of ARS, in the absence of active trading by holders, ARS became increasingly vulnerable to intervention by ML, in its capacity as an auction dealer, to influence interest and dividend rates and create the appearance of liquidity.

92.   Upon information and belief, as a result of insufficient investor participation in the auctions, ML was able to and did assert control over the clearing rates and the success or failure of the auctions.

93.   As an auction dealer, ML exercised near complete control over information associated with auctions.  ML knew the number of bidders at an

auction, the individual and aggregate dollar amount of bids, the range of bid prices, whether there were sufficient bids by investors for the auction to succeed, and the clearing rates in successful auctions before those rates were disclosed to the issuer and investors. ML also knew whether it submitted bids at an auction and whether those bids were necessary for the auction's success.

94.     As an auction dealer, ML knew or should have known that the number of sellers for ARS was becoming increasingly saturated and that adverse trends in the credit markets or unfavorable news about ARS would result in an increase in the imbalance between sellers and buyers of ARS. Because of this imbalance, ML knew or should have known that its auctions would have failed without ML's intervention and other manipulative acts.

95.     ML took advantage of the opportunity to manipulate the auctions for ARS and ensured that investors lacked sufficient information to determine that those auctions cleared only because of ML's interventions.

### iii.     ML Knew Or Should Have Known That ARS Lacked Sufficient Maximum Rates To Ensure Liquidity In The Event Of A Failed Auction

96.     ML knew or should have known that investors would purchase ARS only if those securities were highly rated by credit rating agencies such as Fitch Ratings, Moody's Investor Service, and Standard & Poor's.

97.    As an underwriter, ML understood that it could obtain AAA ratings for the ARS it underwrote only if those securities carried low maximum rates, as the higher the rate, the riskier the securities would be deemed to be by the rating agencies.  In general, ML served as an auction dealer for the ARS that it underwrote.

98.    Upon information and belief, between the fall of 2007 and February 2008, ML underwrote billions of dollars in ARS with maximum rates that were insufficient to ensure the liquidity of those securities in the event of a failed auction.

99.    Upon information and belief, a large proportion of the ARS that ML underwrote received AAA ratings.  ML touted AAA ratings as a selling point.

100.   Although ML obtained AAA ratings to provide the appearance of quality and safety of principal, ML knew or should have known that those ratings actually reflected the limited liquidity of ARS in the form of low maximum rates.

### iv.    ML's Manipulation Of The Market Was Designed To Limit Its Own Exposure To ARS

101.   Upon information and belief, ML's own internal documents show that ML engaged in manipulative conduct to sell ARS in order to reduce its own inventory of those securities.

102.   Recognizing the risk of having to hold ARS until maturity, Defendants imposed a ceiling on the amount of ARS that ML could hold in its own inventory.  Upon information and belief, as ML's inventory increased after institutional investors began selling down their holdings in the fall of 2007, ML came under increasing pressure to reduce its ARS holdings.

103.   Upon information and belief, Defendants came under additional pressure to reduce inventory in the fall of 2007, as lenders that had provided financing for ML's inventory of ARS stopped accepting those securities as loan collateral.  Lenders recognized that ML had amassed an excess inventory of ARS by supporting auctions for which no other buyers existed, and those securities could not be sold at par if ML needed to liquidate its portfolio.

104.   As a result, the liquidity of ARS purchased by investors became even more dependent on Defendants' own financial condition and willingness to continue propping up the ARS market.

### v.   ML Knew Or Should Have Known That The Market For ARS Was Unsustainable

105.   Notwithstanding ML's efforts to manipulate and sustain the ARS market, by on or about August 2007, ML knew or should have known that the market was unsustainable.

106.   Upon information and belief, on or around November 2007, ML considered the possibility of withdrawing support for all future auctions.

107.   Upon information and belief, around the same time, ML anticipated that firms that insured certain ARS would be downgraded, which would prompt investors to sell those securities. ML understood that the ARS market would collapse following these downgrades.

108.   ML did not disclose its internal discussions over its withdrawal of support for ARS or its knowledge of the weakening and possible collapse of the ARS market. Instead, ML continued to encourage its financial advisors to sell ARS through the first half of February 2008.

109.   Despite its knowledge of the weakening and possible collapse of the ARS market ML told its financial advisors and investor clients, directly and through several published reports on or about February 8, 2008 that: ML considered ARS to be "the conservative's conservative security"; failed auctions were "an aberration" for which ML did not expect to see multiple recurrences"; "there has been no official confirmation" of auction dealers exiting the ARS market; and that rumors of auction dealers exiting the market were not "a sign of something more ominous to come."

110.   These reports published by ML's research analysts, made at the same time that ML knew or should have known that the ARS market was on the

verge of collapse, demonstrate ML's intent to manipulate the market by continuing

to convince its investors of the safety and liquidity of ARS.

      **vi.**    **ML's Internal Discussions Concerning The Possibility Of A "Run On The Market" Demonstrate Its Intent To Manipulate Or Deceive**

     111.  ML knew or should have known that the continued viability of

the ARS market depended upon its own conduct as well as that of the other auction

dealers.  ML and other auction dealers knew or should have known that if one

auction dealer permitted widespread auction failures, a "run on the bank" would

ensue, with panic selling by investors, and the auction dealers being forced to

choose between (a) attempting to sustain the ARS market by buying all securities

offered at auction and (b) allowing the auctions to fail *en masse*.

     112.  As a result, ML and other auction dealers had a common

interest in suppressing auction failures.  Upon information and belief, in

furtherance of their common interests, and with a tacit or express understanding

that other auction dealers would similarly act to suppress auction failures, ML

continued to intervene to prevent auction failures even after the ultimate demise of

the ARS market was widely anticipated by decision-makers at ML; ML monitored

the actions of its competitors to determine if other auction dealers appeared likely

to withdraw their support for the auctions; and ML communicated directly with

competitors in an attempt to determine the time and circumstances under which

ML's competitors were likely to withdraw their support for the market.

113.   Upon information and belief, ML executives feared that

exposure of the true condition of the ARS market would cause its collapse.  As a

result, ML took steps to conceal this information from investors.

**D.     Plaintiff Relied On The Representation That SLARS Were Safe, Liquid, Short-Term Investments**

114.   Between August 2007 and February 2008, Plaintiff reasonably

relied upon the fraudulent representations and omissions of ML in deciding to

purchase and maintain its investments in SLARS.

115.   At no time did ML give warning to Plaintiff that the demand for

SLARS was decreasing and the market was becoming increasingly risky.

116.   At no time did ML give warning to Plaintiff that, as the result

of reduced demand, ML was purchasing more and more SLARS for its own

inventory in order to keep the auctions from failing.

117.   At no time did ML inform Plaintiff that SLARS did not meet

the requirements of the County of Maui's Investment Policy.

118.   At all relevant times, ML knew or should have known that

Plaintiff was purchasing investments pursuant to HRS §46-50 and ML knew or

should have known the requirements thereof.  ML knew or should have known that

all the investments purchased by Plaintiff were subject to the requirements of HRS §46-50.

119.   Similarly, at all relevant times ML knew or should have known that Plaintiff was purchasing SLARS as a short-term, highly-liquid, very safe investment.

120.   Despite ML's knowledge of Plaintiff's limited investment options, ML actively marketed SLARS to Plaintiff as suitable for its needs.  ML's Officers within its Hawaii Office regularly contacted Plaintiff – sometimes several times a day – to market/sell SLARS.

121.   On December 6, 2007, ML represented to Plaintiff that the ARS market "offers extraordinary values for short-term yield-maximizing investors, not just the ultra short-term cash investor."

122.   In a Fixed Income Digest Special Edition dated December 6, 2007, ML represented that "the auction preferred market offers excellent value for investors looking for short-term instruments or money market alternatives."

123.   In the same digest, ML provided that "[r]ates on auction preferred securities remain high while other rates are declining, creating what we think is extraordinary value for investors looking for short term instruments."

124.   ML further expressed its belief that "auction market securities are safe instruments" and that "worries of a failed auction are misplaced."

125.   On December 13, 2007, even as ML knew or should have known that the demand for SLARS was decreasing and such investments were becoming increasingly risky, ML provided Plaintiff with a strategists report which reiterated "the strong credit quality and attractive yields" of SLARS and encouraged investors to invest in these securities that were effectively described as "short-term securities."

126.   As late as February 12, 2008, ML provided reports by email from financial advisors in ML's Honolulu office to Plaintiff to allay any concerns regarding the ARS markets.

127.   On February 12, 2008, ML provided to Plaintiff by email from a financial advisor in ML's Honolulu office an "Auction Market Securities Report" wherein ML reiterated that ARS has only a "slightly lesser degree of liquidity" than money market funds and reminds investors that auctions "hardly ever" fail.

128.   Also on February 12, 2008, ML also provided a report to Plaintiff by email from a financial advisor in ML's Honolulu office called "Back to Basics in the Auction Market" wherein ML represented that "[t]he reports of the imminent demise of the auction market seem to be greatly exaggerated, again."

129.   In the same report, ML also touted the resiliency of the auction market and represented that with regard to broker dealers ceasing support of

auctions that "[a] few failed auctions should certainly not be synonymous with [broker dealers] leaving the business."

130.   In this report, ML represented its belief that the failed auctions in the closed-end fund auction market was an aberration and that ML considered these investments as the "conservative's conservative investment."

131.   Had ML honestly disclosed to Plaintiff the true nature of SLARS investments and had ML disclosed to Plaintiff that SLARS did not meet the requirements of HRS §46-50, Plaintiff would not have purchased SLARS at all and/or would not have maintained its investment in SLARS.

132.   Furthermore, had ML honestly disclosed the growing risks associated with investing in SLARS, Plaintiff would not have purchased SLARS at all and/or would not have maintained its investments in SLARS.

133.   Between August 2007 and February 2008, ARS were widely held among numerous classes of investors including individuals, small businesses, charities, and large corporate and institutional holders.

134.   ARS and the auction market had existed since about 1984, and had developed rapidly since that time.

135.   According to the ML research report published on February 4, 2008 and provided to Plaintiff on February 12, 2008, "Closed-end auction market preferred have been around for 20 years.  They have been through the S&L and

banking crises of the late 1980s and early 1990s, the Asian contagion, and the 2002 accounting scandals."

136.   ML publicly dismissed the possibility of an auction failure, stating in the December 6, 2007 research report provided to Plaintiff by email the same day from ML's Honolulu office that "worries of a failed auction are misplaced:  failed auctions are extremely rare, and investors may have an exaggerated view of their consequences."

137.   Through these reports and similar statements made within these reports and by email and telephone, ML encouraged Plaintiff to believe that ARS was a safe, short-term investment, that sufficient market demand existed for ARS and that the market for ARS was free of manipulation.

**E.     Plaintiff Suffered Damage**

138.   Plaintiff purchased SLARS through ML between August 16, 2007 and January 16, 2008.

139.   On or about August 16, 2007, Plaintiff invested $2,000,000.00 in SLARS through ML.  This investment was identified by CUSIP #78442GEUH6.

140.   On or about August 29, 2007, Plaintiff invested an additional $4,000,000.00 in SLARS though ML.  This investment was identified by CUSIP #78842GHZ2.

141.   On or about September 27, 2007, Plaintiff invested $7,000,000.00 in SLARS through ML.  This investment was identified by CUSIP #78443CAJ3.

142.   On or about November 7, 2007, Plaintiff invested $8,200,000.00 in SLARS through ML.  This investment was identified by CUSIP #78442GJA5.

143.   On or about January 10, 2008, Plaintiff invested $3,000,000.00 in SLARS through ML.  This investment was identified by CUSIP #7844CBC7.

144.   On or about January 15, 2008, Plaintiff invested $14,000,000.00 in SLARS through ML.  This investment was identified by CUSIP #7844CAP9.

145.   Finally, on or about January 16, 2008, Plaintiff invested $6,000,000.00 in SLARS through ML.  This investment was identified by CUSIP #78443CBB9.

146.   Upon information and belief, as to each such SLARS purchased by Plaintiff, ML served as the sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer.  In such capacity and with respect to each such ARS purchased by Plaintiff, Defendants engaged in the manipulative or deceptive devices, contrivances, schemes and artifices to defraud alleged herein, including, but not limited to, ML's intervention in auctions for the ARS purchased

by Plaintiff for the purpose and with the effect of masking the true value of such

ARS, preventing auction failures, setting the rates of interest or dividends paid on

ARS, and depriving Plaintiff of the information necessary to assess the risk

characteristics of ARS.  By their actions, Defendants directly and proximately

caused Plaintiff's injuries.

147.    Subsequent to the collapse of the ARS market, Plaintiff has

been unable to sell at par the SLARS it purchased between August 2007 and

January 2008.

148.    Although federal and state securities regulators have forced

Defendants to repurchase at par value ARS that ML sold to certain retail investor

clients and others, Plaintiff continues to hold $32,000,000.00 in illiquid SLARS.

149.    In its annual report for the fiscal year ended December 26,

2008, filed with the SEC on Form 10-K on February 24, 2009, Merrill admitted

that the auction failures have left auction rate securities, including ARS, with no

observable valuation methodology.

150.    In the same annual report, Merrill announced that, for the fiscal

year ended December 26, 2008, it had taken a charge of $375 million (exclusive of

an additional $125 million fine) in connection with Defendants' offer to repurchase

ARS from certain investor clients made pursuant to Defendants' agreement with

federal and state securities regulators. The charge recorded by Merrill constitutes

an acknowledgement that ARS acquired by Plaintiff are worth less than par value.

**F.     Regulators Settle Some Claims Against ML For Fraud In The ARS Market**

151.   ML has been subject of various investigations and proceedings

by state and federal securities regulators and law enforcement officials for its

involvement in the ARS market.

152.   Following the collapse of the ARS market in February 2008,

and after the filing of several lawsuits against Defendants and other financial firms,

state and federal regulators commenced investigations into securities fraud and

related claims by ML.

153.   As described in a press release issued on August 22, 2008 by

the SEC, entitled, "SEC Enforcement Division Announces Preliminary Settlement

With Merrill Lynch to Help Auction Rate Securities Investors," the SEC's

investigation involved alleged misrepresentations by ML to its clients that ARS

"were safe, highly liquid investments equivalent to money market instruments and

cash." According to the press release, the SEC contended that ML "did not make

adequate disclosures that the liquidity of these securities was based on Merrill

Lynch supporting the auctions it managed when there was not enough demand. . . .

Furthermore, Merrill Lynch continued to tout the purported liquidity of ARS to

customers despite its awareness of the escalating liquidity risks in the weeks and months preceding the collapse of the ARS market."

154. The August 22, 2008 SEC press release also announced that ML had agreed to a settlement in principle with federal and state regulators that permanently enjoins ML "from violating the provisions of Section 15(c) of the Securities Exchange Act of 1934, and Rule 15c1-2 thereunder, which prohibit the use of manipulative or deceptive devices by broker-dealers."

155. The proposed regulatory settlement involved the repurchase of ARS only from certain eligible investors. The proposed regulatory settlement did not provide relief to other investors who were harmed by ML's manipulation of the ARS market, including institutional investors who purchased ARS from ML. These investors, including Plaintiff, either continue to hold illiquid ARS, or have sold those securities at a loss.

## LOSS CAUSATION/ECONOMIC LOSS

156. As alleged above, ML engaged in a comprehensive scheme and course of conduct to create, prop up, perpetuate, and manipulate for their own benefit the market for ARS and to generate underwriting and auction dealer fees to the detriment of Plaintiff.

157. This comprehensive scheme and course of conduct operated as a fraud or deceit on Plaintiff by, among other things, providing false information to

Plaintiff and other investors that ARS were safe, liquid, short-term investments, and concealing the increasing risks of investing in ARS and ML's intention of selling its own inventory of ARS to the detriment of Plaintiff and other investors buying these ARS.

158.   The materialization of the risks concealed by ML was foreseeable to ML between August 2007 and February 2008 when ML knew of their impending withdrawal of support for the auctions but concealed that fact from Plaintiff.

159.   Those risks materialized when ML and other auction dealers refused to continue serving as buyers of last resort for ARS and the ARS market collapsed, leaving Plaintiff's ARS illiquid.

160.   Materialization of those risks and subsequent disclosures of those risks directly and/or proximately caused the damages sustained by Plaintiff.

161.   Only through the persistent conduct of ML and other auction dealers in artificially supporting, maintaining, and intervening in the auctions, acting as buyers of last resort, and setting the clearing rates was the market for ARS able to exist between August 2007 and February 2008.

162.   The ARS market depended on the voluntary, pervasive, and ongoing participation of ML and other auction dealers in the manipulation of interest and dividend rates and their acquisition of ARS to keep the auctions from

failing. The conduct of ML and other auction dealers created an illusory market that, unbeknownst to Plaintiff, had a high risk of failing and leaving Plaintiff with illiquid SLARS.

163. Upon information and belief, between August 2007 and February 2008, Defendants' senior management recognized that ML's ongoing manipulation of the auction process for ARS, through the submission of purchase bids designed to prevent failed auctions or set clearing rates, created excessive risk to ML in the form of an ever-increasing inventory of ARS. As a result, ML systematically sold down its own inventory of ARS through an aggressive marketing campaign targeted at selling the same to Plaintiff and other similarly situated investors.

164. ML failed to disclose the purpose, nature, and effect of their manipulative conduct to Plaintiff and the investing public generally.

165. It was materially deceptive for ML to market ARS to Plaintiff as safe, liquid, short-term investments when in fact ARS were not.

166. When the auctions failed, the concealed risks that ARS would not trade materialized.

167. Because of ML's manipulation of the ARS market, Plaintiff was damaged when ML withdrew its support for the auction market.

168.   If not for ML's manipulation of the market for ARS, Plaintiff would not have purchased ARS.

169.   Had ML told Plaintiff of their impending withdrawal of support for the auctions, Plaintiff would have immediately sold its ARS.

170.   As a result of the materialization of the concealed risk that ML was manipulating the market for ARS, the true value and liquidity characteristics of ARS have been revealed.  ARS remain illiquid and cannot be sold at par value on the open market.  A recently developed secondary market values illiquid ARS at steep discounts to par value.  Investors who have sold their ARS on this secondary market have realized substantial losses.

171.   In addition, ML's comprehensive, manipulative, and deceptive conduct caused the interest and dividend rates on ARS both before and after the collapse of the auction market to be considerably lower than the rates that the market would have placed on them had the investing public been aware of the true characteristics and risks of ARS and the auction market.

172.   Accordingly, Defendants' wrongdoing directly or proximately caused economic losses to Plaintiff by leaving it stuck with $32,000,000.00 in illiquid SLARS.

## COUNT I:        VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10(B)-5 PROMULGATED THEREUNDER

173.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 172 herein.

174.    As set forth herein, in order to have Plaintiff purchase SLARS, ML intentionally and/or recklessly: (a) employed a device, scheme and artifice to defraud Plaintiff with respect to the sale of SLARS; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices or courses of business which operated as a fraud and deceit upon Plaintiffs in connection with the sale and purchase of the SLARS, in violation of Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)), and Rule 10b-5 promulgated thereunder.

175.    Between August 2007 and February 2008, ML employed manipulative or deceptive devices, in contravention of Rule 10(b)-5, which were intended to and did; (i) deceive Plaintiff; (ii) enable ML to underwrite and serve as an auction dealer for billions of dollars of ARS, and on which ML made substantial underwriting and auction dealer fees; (iii) enable ML to sustain an artificial market for ARS and conceal failures of auctions for ARS; and (iv) enable ML to manipulate interest rates for ARS; and (v) cause Plaintiff to purchase risky ARS to move such ARS off ML's balance sheets.

176.   ML employed manipulative or deceptive devices or contrivances, schemes and artifices to defraud, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive Plaintiff as to the liquidity, safety and nature of ARS by, among other things, misleading Plaintiff to believe that ARS were safe, short-term investments.

177.   ML's manipulative conduct was furthered by the use, means, or instrumentalities of interstate commerce and/or the mails, including but not limited to use of the wires, by ML personnel to plan and transmit instructions for the manipulation of auctions for ARS and to transmit to Plaintiff and ML's financial advisors the research reports concerning ARS described herein.

178.   ML had actual knowledge of the devices, schemes, and artifices to defraud and acts, practices, and course of business which operated as a fraud and deceit upon Plaintiff, as set forth herein, or acted with deliberate disregard of the fraudulent or deceitful nature of said conduct.

179.   ML employed the devices, schemes, and artifices to defraud and engaged in the acts, practices, and course of business described herein, knowingly or deliberately and for the purpose and effect of (a) manipulating the market for ARS, (b) concealing the truth about the value, liquidity, and risks of ARS from Plaintiff, and (c) supporting the failing market for ARS.

180.   If ML did not have actual knowledge of the devices, schemes, and artifices to defraud and acts, practices, and course of business which operated as a fraud and deceit on Plaintiff, it was deliberately reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover the manipulative purpose, nature, and effect of their conduct.

181.   As a result of ML's devices, schemes, and artifices to defraud and acts, practices, and course of business, Plaintiff purchased SLARS between August 2007 and January 2008.

182.   In ignorance of the fact that the ARS were increasingly risky investments, and relying on the representation that ARS were short-term liquid investments, Plaintiff acquired SLARS and was damaged thereby.

183.   At the time ML employed the devices, schemes, and artifices to defraud and engaged in the acts, practices, and course of business described herein, Plaintiff was ignorant of ML's conduct, and believed ARS was a safe, short-term investment.

184.   Had Plaintiff known the truth regarding the value, liquidity, and risks of ARS, including the extent to which the market for ARS was sustained by ML, Plaintiff would not have purchased ARS at all and/or would have sold its ARS holdings.

185. By virtue of the foregoing, ML has violated Section 10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

186. As a direct and proximate result of ML's wrongful conduct, Plaintiff suffered damages in connection with its purchase of ARS between August 2007 and January 2008.

187. In addition to the foregoing, in order to have Plaintiff purchase SLARS, ML engaged in a series of fraudulent and deceitful acts or practices, including knowingly and/or recklessly making representations and omissions of material facts including but not limited to the following:

> (a) ML affirmatively marketed and sold SLARS to Plaintiff as highly liquid investments at a time when ML knew or should have known that such SLARS were increasingly at risk to become illiquid. ML misrepresented the nature of SLARS in several reports emailed to Plaintiff by financial advisors in ML's Honolulu office.

> - On February 26, 2007, a financial advisor in ML's Honolulu office emailed a report to Plaintiff entitled "FASB 95 Auction Buying Opportunity" prepared by ML preferred strategist, Kevin Connery, regarding the effect of FASB's decision to prohibit corporations from accounting for ARS as cash equivalent instruments. In this report ML minimized the significance of the FASB decision stating:

>> Our bottom line around the current accounting challenge facing the auction market is that it is nothing more than that. It is not the death of the auction market. It is a challenge that will result in a decline in the absolute number of investors in the short

term. It is also a situation that may result in a
buying opportunity for those investors that
remain in the market.

- Among other statements made in this report was that ML "ha[d]
  never heard of an investor stuck into an extended auction
  against the investor's wishes."

- ML further represented in this report that it "believes that
  [auction securities] can be treated as cash equivalents under
  FASB 95, provided they can satisfy the 90-day restriction."

- On March 22, 2007, a financial advisor in ML's Honolulu
  office emailed a report to Plaintiff prepared by ML strategist,
  Kevin Connery, regarding the market impact from the Financial
  Accounting Standards Board's ("FASB's") elimination of a
  "cash equivalents" classification. ML expressed that the
  "market impact should be positive with greater liquidity."

- On April 26, 2007, a financial advisor in ML's Honolulu office
  emailed a report to Plaintiff prepared by ML strategists, Kevin
  Conery and Theresa O'Neill, providing "An Overview of
  Auction Rate Student Loan ABS Market." In this report, ML
  expressed that "there ha[d] been no failed auctions in the
  student loan sector" and that ML "view[ed] the risk of a failed
  auction to be minimal."

- On December 6, 2007, a financial advisor in ML's Honolulu
  office emailed a report to Plaintiff prepared by ML strategists
  entitled "Enduring value in auction securities" dated December
  6, 2007 wherein ML explained that "the auction preferred
  market, offers excellent value for investors looking for short-
  term instruments or money market alternatives"; that
  "individual investors are largely shielded" from problems
  facing the financial markets; that closed end fund preferred
  auction rate securities were "a conservative's conservative
  auction security"; that "[c]redit fears" were "largely misplaced
  in [the] auction market"; that "the worries of a failed auction

are misplaced: failed auctions are extremely rare, and investors
may have an exaggerated view of their consequences"; that
"[i]n the unlikely event of a failed auction. . . [t]he investor who
is willing to wait for a subsequent auction to clear may be able
to eventually receive par value back"; that the "main risk" for
investors in ARS was "lower rates"; and that "auction securities
still make sense for investors who need ready access to their
funds."

- This December 6, 2007 report noted that ARS offered
  "extraordinary values" for both the short-term investor and the
  "cash investor."

- On December 13, 2007, a financial advisor in ML's Honolulu
  office emailed a report to Plaintiff prepared by ML strategists
  entitled "Overview and Update of Student Loan Auction Notes"
  dated December 13, 2007. In this report, ML marketed SLARS
  citing "strong credit quality and attractive yields" and
  reminding investors that "no failed auctions have occurred in
  the student loan ARS market."

- On February 8, 2008, ML released for use by its sales force and
  the public a research report entitled "Back to Basics in the
  Auction Market" which, on the front page, touted the auction
  market's "resiliency" and referred to "greater liquidity." The
  report minimized the recent failures and encouraged customers
  to invest in its securities.

- On February 12, 2008, a financial advisor in ML's Honolulu
  office emailed Plaintiff the report entitled "Back to Basics in
  the Auction Market" wherein ML reiterated that ARS has only
  a "slightly lesser degree of liquidity" than money market funds
  and reminds investors that auctions "hardly ever" fail. ML
  further expressed that "[t]he reports of the imminent demise of
  the auction market seem to be greatly exaggerated, again."

(b) ML failed to disclose to Plaintiff, among other things, that:

(i) SLARS did not meet the requirements of the County of Maui's Investment Policy and/or the requirements for short-term investments set forth in HRS §46-50;

(ii) Beginning in August 2007 there was a substantial decrease in market demand for SLARS;

(iii) ML as Auction Manager was increasingly purchasing SLARS for its own account to conceal the decrease in market demand;

(iv) ML had the issuers obtain temporary waivers from the ratings agencies to avoid downgrades to the AAA ratings conferred on the SLARS;

(v) ML was contemplating ending its decades-old practice of supporting the ARS auctions, which it knew or should have known would cause the market to collapse and render all SLARS illiquid;

(vi) Sellers and supply of ARS outstripped buyers and demand for ARS; that this imbalance in supply and demand for ARS would lead to auction failures; and

(vii) To avoid losses on its own balance sheets, ML needed to intervene to create and perpetuate the illusion of ARS as safe, liquid, short-term investments suitable for Plaintiff so it could get ARS off its own balance sheet.

188.   As ML intended, Plaintiff reasonably relied upon the representations and omissions of ML in deciding in and after August 2007 to purchase SLARS from ML.  Had Plaintiff known the truth, it would not have purchased SLARS.

189.   In addition, Rule 10(b)-5 prohibits a broker from purchasing securities unsuited to the buyer's needs, where the broker knows or reasonably believes that the securities are unsuited for the buyer, and the broker makes material misrepresentations or fails to disclose material information relating to the suitability of securities.

190.   Plaintiff disclosed its Investment Policy to ML, which included purchasing only short-term highly-liquid securities. ML also knew or should have known that Plaintiff was limited in its investment options by Hawaii State law and knew or should have known of the limitations thereof. ML knew or should have known that Plaintiff was limited to short-term investments with a maturity less than five years from the date of investment. At all relevant times, ML was aware of Plaintiff's investment objectives and limitations.

191.   ML recommended that Plaintiff purchase SLARS from ML, without reasonable grounds for believing that those investments were suitable for Plaintiff. In fact, SLARS were not suitable, particularly starting August 2007, and grew increasingly risky into 2008. Yet, ML continued to sell SLARS to Plaintiff to reduce ML's own inventory of SLARS and without regard to the suitability of such investments for ML.

192.   For these reasons, ML must repurchase the SLARS it sold to Plaintiff at par and pay all damages arising from the illiquidity of the SLARS in an amount to be determined at trial.

## COUNT II: VIOLATIONS OF HAWAII BLUE SKY LAWS, HRS §485-25

193.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 192 herein.

194.   ML directly or indirectly: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, and a course of business which operated as a fraud or deceit upon Plaintiff in connection with the offer, sale and purchase of SLARS in the State of Hawaii in violation of HRS §485-25.

195.   Between the fall of 2007 and early 2008, Plaintiff reasonably relied upon the fraudulent representations and omissions of Plaintiff in deciding to purchase SLARS from ML.  Plaintiff fraudulently and/or recklessly made representations and/or omissions including but not limited to the following:

> (a) ML affirmatively marketed and sold SLARS to Plaintiff as highly liquid investments at a time when ML knew or should have known that such SLARS were increasingly at risk to become illiquid. ML misrepresented the nature of SLARS in several reports emailed to Plaintiff by financial advisors in ML's Honolulu office.

- On February 26, 2007, a financial advisor in ML's Honolulu office emailed a report to Plaintiff entitled "FASB 95 Auction Buying Opportunity" prepared by ML preferred strategist, Kevin Connery, regarding the effect of FASB's decision to prohibit corporations from accounting for ARS as cash equivalent instruments. In this report ML minimized the significance of the FASB decision stating:

  > Our bottom line around the current accounting challenge facing the auction market is that it is nothing more than that. It is not the death of the auction market. It is a challenge that will result in a decline in the absolute number of investors in the short term. It is also a situation that may result in a buying opportunity for those investors that remain in the market.

- Among other statements made in this report was that ML "ha[d] never heard of an investor stuck into an extended auction against the investor's wishes."

- ML further represented in this report that it "believes that [auction securities] can be treated as cash equivalents under FASB 95, provided they can satisfy the 90-day restriction."

- On March 22, 2007, a financial advisor in ML's Honolulu office emailed a report to Plaintiff prepared by ML strategist, Kevin Connery, regarding the market impact from the Financial Accounting Standards Board's ("FASB's") elimination of a "cash equivalents" classification. ML expressed that the "market impact should be positive with greater liquidity."

- On April 26, 2007, a financial advisor in ML's Honolulu office emailed a report to Plaintiff prepared by ML strategists, Kevin Conery and Theresa O'Neill, providing "An Overview of Auction Rate Student Loan ABS Market." In this report, ML

expressed that "there ha[d] been no failed auctions in the
student loan sector" and that ML "view[ed] the risk of a failed
auction to be minimal."

- On December 6, 2007, a financial advisor in ML's Honolulu
  office emailed a report to Plaintiff prepared by ML strategists
  entitled "Enduring value in auction securities" dated December
  6, 2007 wherein ML explained that "the auction preferred
  market, offers excellent value for investors looking for short-
  term instruments or money market alternatives"; that
  "individual investors are largely shielded" from problems
  facing the financial markets; that closed end fund preferred
  auction rate securities were "a conservative's conservative
  auction security"; that "[c]redit fears" were "largely misplaced
  in [the] auction market"; that "the worries of a failed auction
  are misplaced:  failed auctions are extremely rare, and investors
  may have an exaggerated view of their consequences"; that
  "[i]n the unlikely event of a failed auction. . . [t]he investor who
  is willing to wait for a subsequent auction to clear may be able
  to eventually receive par value back"; that the "main risk" for
  investors in ARS was "lower rates"; and that "auction securities
  still make sense for investors who need ready access to their
  funds."

- This December 6, 2007 report noted that ARS offered
  "extraordinary values" for both the short-term investor and the
  "cash investor."

- On December 13, 2007, a financial advisor in ML's Honolulu
  office emailed a report to Plaintiff prepared by ML strategists
  entitled "Overview and Update of Student Loan Auction Notes"
  dated December 13, 2007.  In this report, ML marketed SLARS
  citing "strong credit quality and attractive yields" and
  reminding investors that "no failed auctions have occurred in
  the student loan ARS market."

- On February 8, 2008, ML released for use by its sales force and
  the public a research report entitled "Back to Basics in the

Auction Market" which, on the front page, touted the auction market's "resiliency" and referred to "greater liquidity." The report minimized the recent failures and encouraged customers to invest in its securities.

- On February 12, 2008, a financial advisor in ML's Honolulu office emailed Plaintiff the report entitled "Back to Basics in the Auction Market" wherein ML reiterated that ARS has only a "slightly lesser degree of liquidity" than money market funds and reminds investors that auctions "hardly ever" fail. ML further expressed that "[t]he reports of the imminent demise of the auction market seem to be greatly exaggerated, again."

(b) ML failed to disclose to Plaintiff, among other things, that:

(i) SLARS did not meet the requirements of the County of Maui's Investment Policy and/or the requirements for short-term investments set forth in HRS §46-50;

(ii) Beginning in August 2007 there was a substantial decrease in market demand for SLARS;

(iii) ML as Auction Manager was increasingly purchasing SLARS for its own account to conceal the decrease in market demand;

(iv) ML had the issuers obtain temporary waivers from the ratings agencies to avoid downgrades to the AAA ratings conferred on the SLARS;

(v) ML was contemplating ending its decades-old practice of supporting the ARS auctions, which it knew or should have known would cause the market to collapse and render all SLARS illiquid;

(vi) Sellers and supply of ARS outstripped buyers and demand for ARS; that this imbalance in supply and demand for ARS would lead to auction failures; and

(vii) To avoid losses on its own balance sheets, ML needed to intervene to create and perpetuate the illusion of ARS as safe, liquid, short-term investments suitable for Plaintiff so it could get ARS off its own balance sheet.

196.   Had Plaintiff known the truth, it would not have purchased SLARS from ML.

197.   For these reasons, ML must repurchase the SLARS it sold to Plaintiff at par and pay all damages arising from the illiquidity of the SLARS in an amount to be determined at trial.

### COUNT III:     FRAUD

198.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 197 herein.

199.   Between August 2007 and February 2008, in order to have Plaintiff purchase SLARS, ML knowingly and/or recklessly made misrepresentations and omissions of material facts to Plaintiff including but not limited to the following:

(a) Affirmatively marketing and selling SLARS to Plaintiff as highly liquid investments at a time when ML knew or should have known that such SLARS were increasingly at risk to become illiquid. ML misrepresented the nature of SLARS in several reports emailed to Plaintiff by financial advisors in ML's Honolulu office.

- On February 26, 2007, a financial advisor in ML's Honolulu office emailed a report to Plaintiff entitled "FASB 95 Auction Buying Opportunity" prepared by ML preferred strategist,

Kevin Connery, regarding the effect of FASB's decision to prohibit corporations from accounting for ARS as cash equivalent instruments. In this report ML minimized the significance of the FASB decision stating:

> Our bottom line around the current accounting challenge facing the auction market is that it is nothing more than that. It is not the death of the auction market. It is a challenge that will result in a decline in the absolute number of investors in the short term. It is also a situation that may result in a buying opportunity for those investors that remain in the market.

- Among other statements made in this report was that ML "ha[d] never heard of an investor stuck into an extended auction against the investor's wishes."

- ML further represented in this report that it "believes that [auction securities] can be treated as cash equivalents under FASB 95, provided they can satisfy the 90-day restriction."

- On March 22, 2007, a financial advisor in ML's Honolulu office emailed a report to Plaintiff prepared by ML strategist, Kevin Connery, regarding the market impact from the Financial Accounting Standards Board's ("FASB's") elimination of a "cash equivalents" classification. ML expressed that the "market impact should be positive with greater liquidity."

- On April 26, 2007, a financial advisor in ML's Honolulu office emailed a report to Plaintiff prepared by ML strategists, Kevin Conery and Theresa O'Neill, providing "An Overview of Auction Rate Student Loan ABS Market." In this report, ML expressed that "there ha[d] been no failed auctions in the student loan sector" and that ML "view[ed] the risk of a failed auction to be minimal."

- On December 6, 2007, a financial advisor in ML's Honolulu office emailed a report to Plaintiff prepared by ML strategists entitled "Enduring value in auction securities" dated December 6, 2007 wherein ML explained that "the auction preferred market, offers excellent value for investors looking for short-term instruments or money market alternatives"; that "individual investors are largely shielded" from problems facing the financial markets; that closed end fund preferred auction rate securities were "a conservative's conservative auction security"; that "[c]redit fears" were "largely misplaced in [the] auction market"; that "the worries of a failed auction are misplaced:  failed auctions are extremely rare, and investors may have an exaggerated view of their consequences"; that "[i]n the unlikely event of a failed auction. . . [t]he investor who is willing to wait for a subsequent auction to clear may be able to eventually receive par value back"; that the "main risk" for investors in ARS was "lower rates"; and that "auction securities still make sense for investors who need ready access to their funds."

- This December 6, 2007 report noted that ARS offered "extraordinary values" for both the short-term investor and the "cash investor."

- On December 13, 2007, a financial advisor in ML's Honolulu office emailed a report to Plaintiff prepared by ML strategists entitled "Overview and Update of Student Loan Auction Notes" dated December 13, 2007.  In this report, ML marketed SLARS citing "strong credit quality and attractive yields" and reminding investors that "no failed auctions have occurred in the student loan ARS market."

- On February 8, 2008, ML released for use by its sales force and the public a research report entitled "Back to Basics in the Auction Market" which, on the front page, touted the auction market's "resiliency" and referred to "greater liquidity."  The report minimized the recent failures and encouraged customers to invest in its securities.

- On February 12, 2008, a financial advisor in ML's Honolulu office emailed Plaintiff the report entitled "Back to Basics in the Auction Market" wherein ML reiterated that ARS has only a "slightly lesser degree of liquidity" than money market funds and reminds investors that auctions "hardly ever" fail. ML further expressed that "[t]he reports of the imminent demise of the auction market seem to be greatly exaggerated, again."

(b) Failing to disclose to Plaintiff, among other things, that:

(i) SLARS did not meet the requirements of the County of Maui's Investment Policy and/or the requirements for short-term investments set forth in HRS §46-50;

(ii) Beginning in August 2007 there was a substantial decrease in market demand for SLARS;

(iii) ML as Auction Manager was increasingly purchasing SLARS for its own account to conceal the decrease in market demand;

(iv) ML had the issuers obtain temporary waivers from the ratings agencies to avoid downgrades to the AAA ratings conferred on the SLARS;

(v) ML was contemplating ending its decades-old practice of supporting the ARS auctions, which it knew or should have known would cause the market to collapse and render all SLARS illiquid;

(vi) Sellers and supply of ARS outstripped buyers and demand for ARS; that this imbalance in supply and demand for ARS would lead to auction failures; and

(vii) To avoid losses on its own balance sheets, ML needed to intervene to create and perpetuate the illusion of ARS as safe, liquid, short-term investments suitable for Plaintiff so it could get ARS off its own balance sheet.

200.   ML made these false statements and fraudulent omissions to Plaintiff with the intention of inducing them to continue to participate in the SLARS market, and to avoid ML from becoming unable to sell its SLARS inventory.

201.   In justifiable reliance upon ML's misrepresentations and omissions, and without knowledge of the truth, Plaintiff purchased SLARS from ML.  Had Plaintiff known the truth, Plaintiff would not have invested in SLARS at all.

202.   As a result of these false and fraudulent misrepresentations, when ML abandoned the auctions, Plaintiff ended up holding illiquid SLARS. Had ML acted honestly, Plaintiff would have sold its SLARS and ML would hold the illiquid securities, not Plaintiff.

203.   As a result of ML's conduct, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT IV:      NEGLIGENT MISREPRESENTATION**

204.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 203 herein.

205.   ML made false and misleading statements of material fact regarding, among other things, the advisability of investing in SLARS, the nature

of the ARS market including ML's involvement in the market, and the liquidity of SLARS.

206.   ML failed to exercise due care in providing information to Plaintiff regarding the advisability of investing in SLARS, the nature of the ARS market including ML's involvement in the market, and the liquidity of SLARS.

207.   Plaintiff reasonably relied on the material misrepresentations made by ML regarding the advisability of investing in SLARS, the nature of the ARS market including ML's involvement in the market, and the liquidity of SLARS.

208.   As a direct and proximate result of ML's failure to exercise due care in making these representations, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT V:      BREACH OF SETTLEMENT AGREEMENTS WITH STATE REGULATORS**

209.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 208 herein.

210.   On or about August 21, 2008, ML entered into a Settlement with various state and federal regulators.

211.   ML agreed to use its "best efforts" to provide liquidity solutions to institutional investors.

212.   On or about June 29, 2009, ML entered into the Assurance of Discontinuance Pursuant to Executive Law §63(15) ("Assurance") wherein ML promised to "expeditiously provide liquidity solutions for institutional investors."

213.   The Settlement and the Assurance are enforceable contracts.

214.   Plaintiff is an intended third-party beneficiary of the Settlement.

215.   Despite demand, ML breached the Settlement by not using its best efforts to provide liquidity solutions to Plaintiff.

216.   As the result of ML's breach, Plaintiff suffered damages in an amount to be determined a trial.

## COUNT VI:      BREACH OF FIDUCIARY DUTY

217.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 216 herein.

218.   As a result of its superior knowledge of the ARS markets, including whether ARS auctions were failing, the extent to which ML increasingly had to support the auctions, and ML's intent (or lack thereof) to continue to support the auctions, ML owed fiduciary duties to Plaintiff.

219.   ML breached its fiduciary duties to Plaintiff in and after August 2007 by not disclosing to Plaintiff that the ARS market in late 2007 was not a suitable investment for Plaintiff and by continuing to sell ARS to Plaintiff in order

to avoid losses by ML on account of ARS that would otherwise have to be held in ML's own portfolio.

220.   As a result of ML's fiduciary breaches, Plaintiff purchased SLARS from ML.

## COUNT VII:   VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT

221.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 220 herein.

222.   Merrill acted as a controlling person of ML within the meaning of Section 20(a) of the Exchange Act for the reasons alleged in the Complaint.

223.   By virtue of its operational and management control of ML's business and systematic involvement in the fraudulent scheme alleged in this Complaint, Merrill had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of ML, including the devices, schemes and artifices to defraud and the acts, practices, and course of business, described herein, which Plaintiffs contend manipulated the market for ARS.

224.   Merrill had the ability to prevent the employment of the devices, schemes, and artifices to defraud and the engagement in the acts, practices and course of business described in this Complaint.

225.   Merrill had direct and supervisory involvement in the operations of ML, and therefore is presumed to have had and exercised the power to control or influence the particular conduct giving rise to the securities violations alleged in this Complaint.

226.   As set forth above, ML violated Section 10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder by its acts and omissions as alleged in this Complaint.

227.   By virtue of its position as a controlling person, Merrill is liable pursuant to Section 20(a) of the Exchange Act.

228.   As a direct and proximate result of Merrill's wrongful conduct, Plaintiff suffered damage in connection with their purchase of ARS during the August 2007 to early 2008 period.

WHEREFORE, Plaintiff demands judgment and relief against Defendants in an amount in excess of the minimum jurisdictional requirements of this Court, as follows:

A.   For judgment in Plaintiff's favor against Defendants.

B.   For judgment directing Defendants to repurchase all SLARS held by Plaintiff that it purchased from ML.

C.   For an award of general and special damages against Defendants in an amount to be determined at trial.

D.     For damages and/or costs resulting from the filing of the

FINRA Arbitration.

E.     For punitive damages against Defendants in an amount to be

determined at trial.

F.     For an award of attorneys' fees and costs against Defendants;

G.     For such other and further relief as the Court deems

appropriate.

DATED:  Honolulu, Hawaii, February 12, 2010.

JOACHIM P. COX
CLAIRE E. GOLDBERG

Attorneys for Plaintiff
COUNTY OF MAUI